UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AUGUSTIN FERNANDO ESCAMILLA-VERA,<br><br>　　　　　　　　Petitioner,<br><br>v.<br><br>ALBERTO R. GONZALEZ,<br><br>　　　　　　　　Respondent. | Civil No. 06-CV-962-L(LSP)<br><br>**FINDING OF FACT re:**<br>**CITIZENSHIP and DIRECTING**<br>**THE CLOSING OF THIS CASE** |

The present petition for a *de novo* determination of petitioner's claim to United States citizenship was brought under 28 U.S.C. § 2241. The case was transferred to the United States District Court for the Southern District of California by the United States Court of Appeals for the Ninth Circuit. On October 24, 2006, the Court heard the testimony of petitioner's mother Patricia Vera-Avina and admitted the administrative record.[1]

**Procedural Background**

Petitioner Escamilla-Vera is in removal proceedings. As a defense to his removal, petitioner contends that he acquired United States citizenship at the time of his birth through his mother's citizenship under 8 U.S.C. § 1401(a)(7) (1952). After a hearing, the Immigration Judge ("IJ") found that petitioner's mother had failed to satisfy the "physical presence" in the United

---

[1] The parties stipulated to the admissibility of the administrative record.

States requirement in order to provide petitioner with citizenship at his birth.[2]  The IJ reached this conclusion by finding petitioner's mother not credible.

Petitioner appealed the IJ's decision to the Board of Immigration Appeals ("BIA") which affirmed the IJ.  Petitioner then appealed to the Ninth Circuit but by stipulation of the parties and under 8 U.S.C. § 1252(b)(5)(B), the Court of Appeals transferred the case for a *de novo* determination whether petitioner's mother satisfied the "physical presence" requirement that would permit the transmission of her United States citizenship to petitioner.

## Legal Requirements

At the time petitioner was born, the citizenship of petitioner's mother could be "transmitted" to him at his birth but only if certain statutory requirements were met.  The Immigration and Nationality Act of 1952, §301(a)(7) provided:

> (A) The following shall be nationals and citizens of the United States at birth:
>
> (7) a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, **prior to the birth of such person was physically present** in the United States or its outlying possessions for a period or periods totaling not less than ten years, **at least five of which were after attaining the age of fourteen years**.

## Factual Background

The following facts are undisputed.  Petitioner was born in Mexico on August 30, 1969.  Petitioner's mother is an United States citizen but his father was not an United States citizen at the time of petitioner's birth.  Petitioner's mother was born on August 23, 1939 and was physically present in the United States for at least five years before her 14th birthday.  Petitioner has never applied for a United States passport or a certificate of citizenship.  Petitioner first claimed United States citizenship through his mother while in removal proceedings but has never relied on an erroneous grant or declaration of United States citizenship.

Before the IJ, petitioner's mother testified that she regularly spent time in the United States after her fourteenth birthday and prior to petitioner's birth to have met sufficiently the five

---

[2] The physical presence requirement appears to have been accepted as met with respect to petitioner's mother's time prior to her fourteenth birthday.

year "physically present" requirement of the INA.

## Patricia V. Avina's Testimony

Petitioner's mother, Patricia V. Avina ("Avina"), testified before the undersigned[3] that she spent the first five years of her life in Chicago before going to live with her paternal grandparents in Mexico. Avina's mother remained in Chicago with Avina's grandmother. During the time leading up to Avina's fourteenth birthday, she spent some years in Mexico and some years in Chicago.

Avina was in Chicago when she had her fourteen birthday in 1953. She returned to Mexico in September 1954, and was married in a civil ceremony in 1955. A religious wedding ceremony was held the following year in Mexico. Avina testified that she visited her grandmother in Chicago for three to four month periods each year from 1956 through 1960. Avina's first child, Gina, was born May 3, 1957 (Exh. B1, B2)[4] and when Gina was three months old, Avina visited her grandmother in Chicago. Gina did not accompany her mother on the trips to Chicago but was instead cared for in Mexico by Avena's husband's aunt, Maria Dolores Escamilla, also known as Lolita Escamilla. Avina's husband was a trucker by profession and would be on the road two to three weeks each month. Avina testified that her husband visited Chicago with her only one time in 1956.

Avina's next child, Laura, was born on June 15, 1958 (Exh. C-1, C2). Again, Avina testified that she traveled by herself to Chicago in October or November 1958 to visit with her grandmother. Avina stated she spent the summer of 1959, June through August, in Chicago. Avina next had a son, Miguel, who was born March 8, 1960 (Exh. D1, D2).[5] Avina testified that her grandmother was ill[6] so she returned to Chicago in September 1960 and remained there until

---

[3] The Court is not relying on the official Court Reporter's transcript of hearing.

[4] The parties have submitted joint exhibits.

[5] The Court takes judicial notice that a full-term pregnancy is 38 weeks. Although the dating of conception is often imprecise, it is likely conception would have occurred mid-June.

[6] Avina testified that her grandmother had arthritis, stomach and blood pressure problems.

September 1962.  Avina's three children, ages three and two years, and six months, remained in Mexico throughout the two-year period.  Avina testified that she did not return to visit with her children and husband in Mexico at any time during that extended time period.

Avina gave birth to sons, Horatio on July 25, 1963 (Exh. F1, F2), and Carlos on October 17, 1964 (Exh. G1, G2).  Avina testified that in March 1965, she returned to Chicago along with her infant son, Carlos, to assist her brother, Jesus Vera,[7] and his wife with their child.  Avina further testified that she remained in Chicago from March 1965 through September or October 1966 because her sister-in-law was suffering from depression.  Exhibit K shows that Avina's son Carlos was admitted as a three-month temporary visitor to the United States on March 10, 1965.[8]  Avina's other four children remained in Mexico under the care of Lolita for the approximate 18 months Avina states she and Carlos were in Chicago in 1965-66.

Avina's daughter Patricia was born in Mexico in 1967.  Avina stated that after Patricia's birth she visited Chicago in the summer of 1968 and returned to Mexico at the end of August 1968.  Avina did not return to Chicago after 1968.  She testified that her grandmother died but did not know when her death occurred.  Petitioner was born in Mexico in August 1969.

## Documentary Evidence in Support of Testimony

At the October 24, 2006 hearing, petitioner presented certain documentary evidence in support of Avina's testimony. Petitioner introduced a letter from Jesse Vera, Avina's brother and petitioner's uncle, dated October 18, 2002, which states in relevant part:

> As requested by my sister, I am verifing [sic] that she was living with me and my family at 1911 S.59th Avenue, Cicero, Illinois **from 1965 through 1966.**  Her husband, during this time, was a truck driver who would visit her periodically at my home. . . .  My sister was married at a very early age, and throughout her life, she has worked steadily to support her children. She should be commended for her great efforts & diligence to raise her family. Even today, she is still working to make ends meet. . . .

(Exh. E)(emphasis added).

---

[7]    Avina's brother appears to be known as both Jesse and Jesus.

[8]    Exhibit K is a Passport indicating that Avina's son Carlos was admitted to the United States as a temporary visitor through Laredo, Texas point of entry on March 10, 1965. There is no indication that Carlos's temporary visitor status was extended during the time he and Avina remained in Chicago.

Petitioner also provided the joint declarations of Dolores Escamilla Garcia and Beatriz Vera Rivera taken on December 28, 2001 to support Avina's testimony. The declaration provides in relevant part:

> Dolores Escamilla Garcia:   accepted as the truth what was declared by Mrs. Vera ac since their children Gina, Laura Patricia, Miguel Angel and Rafael Escamilla Vera, effectively were in my care at my address at Melchor Ocamp 704 of this city during the years 1960 to 1962 and two that Mrs. Avina Vera asked me to care for. Ma. Beatriz Bera Rivera: In my part I recognize in the same manner that the children of Mrs. Vera Avina, Gina, Laura Patricia, Miguel Angel and Rafael were in my care and custody at my address during the years 1964 to 1966.

(Joint Exh.. L-2)

On September 6, 2006, after the Ninth Circuit Court of Appeals transferred the action to the district court, Avina's deposition was taken by respondent's counsel. Avina testified that she last saw her grandmother in 1964. (Depo at 31). During the two years of 1960-62 in which Avina was in Chicago caring for her ill grandmother and her children in Mexico, Avina's husband visited "every time he had a trip he would come" which was "about once a month." (Depo at 31-32). But Avina did not see her children during that two-year period even though her youngest son, Miguel, was approximately five months old when she left for Chicago. (Depo at 32).

Government counsel asked Avina:

Q. So you were there from about August '60 to October '62, and your husband visited you about once a month, so he visited you in Chicago about 25 times?
A. Okay. Yes.
Q. Did you work at all when you were there for two years?
A. No.

(Depo at 34).

. . .

Q. During that three-month period [in 1964], did your husband visit you?
A. In '63. No.
Q. How about during any of your three-month visits or two- or three-month visits? Did your husband ever come up to visit you during those visits?

1      A.    I don't remember whether – it may have been just once, one trip.
2 (Depo at 36).
3      Q.    When you were doing those three-month trips from 1956 to 1960, during certain
4            times of the year, were they always the same time of the year?
5      A.    Not always. It varied.
6      Q.    Do you remember what periods they were?
7      A.    Sometimes I would go during Christmas. I liked going during Christmas, but it
8            varied.
9      Q.    So would you go – you would go visit your grandmother during Christmas and
10           leave your children behind?
11     A.    In Mexico Christmas is not that important, not like in the United States.
12     . . .
13     Q.    And why would you pick summer?
14     A.    Because of the weather. It's prettier during summer than in during winter. The
15           cold weather is too extreme.
16 (Depo at 37-38).
17     A.    I was there in '65, and in '66 I went back [to Mexico].
18     Q.    Do you remember when in '66?
19     A.    Before Christmas, because I spent that with my family back in Mexico, and I was
20           pregnant.
21     Q.    So you went to Chicago in September of '65, and you stayed until sometime in
22           1966, and helped your brother because his wife was depressed?
23     A.    The postpartum depression.
24     Q.    And while you were there, did your husband ever visit you?
25     A.    Yes, because I had little children.
26     Q.    No. I am asking whether your husband came to visit you in Chicago?
27     A.    Yes.
28     Q.    How many times?

1  A.  I don't remember how many times exactly, but whenever he could taking [sic]
2      advantage of a trip he would.
3  (Depo at 40-41)
4  Q.  And how about in '68?
5  A.  I went there, but only for three months.
6  Q.  And do you remember what time of the year it was?
7  A.  Always in the summer.
8  Q.  So in '67 also in the summer?
9  A.  Yes.
10 Q.  And you would stay with your grandmother?
11 A.  No, with my brother.
12 Q.  So you started making three-month trips to Chicago and stayed with your brother?
13 A.  Yes. The last trips I made to Chicago I stayed with him.
14 Q.  Why you didn't [sic] you stay with your grandmother?
15 A.  I didn't know anything more about my grandmother after a time, and I told – I
16     asked my brother, and he said we have lost touch with her because of my mother.
17 (Depo at 43-44)

## Discussion

Much like the IJ, the Court finds the testimony of Avina not credible. There are many inconsistencies within her testimony before the court and in her deposition, and the inconsistencies are significant. These discrepancies include, *inter alia*, the time of year Avina visited Chicago (summer versus Christmas), how long she remained in Chicago, whether and how long her husband visited her when she was in Chicago, whether she was visiting her grandmother or brother, and why Avina lost contact with her grandmother.

The documentary evidence is equally unconvincing in that Avina's brother's letter lack specific time frames for lengthy visits and no mention of repeated two to three month visits. Similarly, the joint declaration of Dolores Escamilla Garcia and Beatriz Vera Rivera broadly

lists years "1960 to 1962" and "1964-66" with no mention of the beginning and/or ending months. The Court finds that it is not credible that Avina believes regular trips to Chicago of two to three months duration are insignificant. It is not plausible that a mother would be willing to be away from her very young children for 20 percent or more of each year to spend time with her grandmother, particularly when the grandmother's daughter and grandson (Avina's brother) live in or near Chicago and the grandmother's ailments are not life threatening. If Avina's testimony was credited concerning her yearly visits of two to three months with her grandmother while Avina's children were toddlers, it defies logic to suggest that it is reasonable that Avina would not know her grandmother's whereabouts after 1964, or how or when her grandmother died even though Avina's brother and mother continued to live in Chicago throughout the time period and Avina had allegedly lived with and was supported entirely by her grandmother for most every year for extended periods of time.

## Conclusion

Having considered all the evidence presented, the Court finds and concludes that Avina's testimony cannot be believed. Accordingly, petitioner has not met his burden of demonstrating that his mother was physically present in the United States for five years between her 14th birthday and petitioner's birth.

Based on the *de novo* hearing and the documentary evidence admitted, **IT IS ORDERED** petitioner is not entitled to claim United States citizenship through his mother.

**IT IS SO ORDERED.**


DATED: November 6, 2006

                                             M. James Lorenz
                                             United States District Court Judge

COPY TO:

HON. LEO S. PAPAS
UNITED STATES MAGISTRATE JUDGE

ALL PARTIES/COUNSEL